UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

QUIANA K. MARSHALL, ON BEHALF OF                    CIVIL ACTION
HER MINOR CHILD, K.P.

VERSUS                                              NO. 18-7411

NANCY A. BERRYHILL,  ACTING                         SECTION "G" (2)
COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION

## REPORT AND RECOMMENDATION

Quiana K. Marshall, proceeding pro se on behalf of her minor child, K.P., seeks

judicial review pursuant to Section 405(g) of the Social Security Act (the "Act") of the

final decision of the Commissioner of the Social Security Administration (the

"Commissioner"), denying plaintiff's claim for childhood Supplemental Security

Income ("SSI") benefits under Title XVI of the Act.  42 U.S.C. §§ 402 et seq. This

matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)

and Local Rule 73.2E(B).

I.      PROCEDURAL HISTORY

K.P. was three years and five months old on November 20, 2014 when his mother

applied for SSI on his behalf, alleging a disability onset date of June 22, 2011, due to

asthma, speech and attention problems. (Tr. 30, 122, 187, 203, 204, 208). However,

"[c]laimants applying to the SSI program may not receive payments for a period predating

the month in which they apply for benefits."  Rosetti v. Shalala, 12 F.3d 1216, 1224 n.20

- 1 -

(3d Cir. 1993) (citing 20 C.F.R. § 416.335); <u>accord</u> <u>Brown v. Apfel</u>, 192 F.3d 492, 495 n.1 (5th Cir. 1999); <u>Wilson v. Colvin</u>, No. 4:15-CV-711, 2017 WL 121056, at *1 n.2 (S.D. Tex. Jan. 11, 2017) (citing 20 C.F.R. § 416.335; <u>Brown</u>, 192 F.3d at 495 n.1).  "Thus, the month following an application . . . fixes the earliest date from which benefits can be paid." <u>Hector v. Barnhart</u>, 337 F. Supp. 2d 905, 910 (S.D. Tex. 2004) (citing 20 C.F.R. § 416.335; <u>Brown</u>, 192 F.3d at 495 n.1). Marshall must show that K.P. was disabled as of November 20, 2014, when she filed for benefits on his behalf, through May 18, 2017, the date of the Administrative Law Judge's ("ALJ") decision.

After her application was denied on September 11, 2015, plaintiff filed a timely request for a hearing, which was conducted before an ALJ on January 25, 2017. (Tr. 114-126, 151, 155). The ALJ issued a decision on May 18, 2017, finding that K.P. was not disabled. (Tr. 29-43). After the Appeals Council denied plaintiff's request for review on May 31, 2018 (Tr. 1-3), the decision of the ALJ became the final decision of the Commissioner for purposes of this court's review.

Plaintiff filed a pro se memorandum of facts and law, Record Doc. No. 16, which she supplemented after being granted leave of court to do so. Record Doc. Nos. 20, 21, 22. The Commissioner filed a reply memorandum of facts and law. Record Doc. No. 19.

II.    <u>STATEMENT OF ISSUES ON APPEAL</u>

Construing her pleading broadly, plaintiff contends that the ALJ made the following errors:

    A.    Substantial evidence does not support the ALJ's finding that K.P.'s impairments do not meet or medically equal the listings.

    B.    Substantial evidence does not support the ALJ's finding that K.P.'s impairments do not functionally equal the severity of the listings.

III.    <u>ALJ'S FINDINGS RELEVANT TO ISSUES ON APPEAL</u>

The ALJ made the following relevant findings:

    A.    K.P. was a preschool child on his application date and a preschool child on the date of the ALJ's decision.

    B.    He has not engaged in substantial gainful activity since November 20, 2014, the application date.

    C.    He has the following severe impairments: attention-deficit hyperactivity disorder; speech delay; and asthma.

    D.    K.P. does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in the Listings.

    E.    K.P. does not have an impairment or combination of impairments that functionally equals the severity of the Listings.

    F.    He has not been disabled from November 20, 2014, the date his application was filed, through the date of the ALJ's decision.

(Tr. 33-43).

IV.    ANALYSIS

A.    Standards of Review

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence.  Waters v. Barnhart, 276 F.3d 716, 716 (5th Cir. 2002); Loza v. Apfel, 219 F.3d 378, 389 (5th Cir. 2000); Spellman v. Shalala, 1 F.3d 357, 360 (5th Cir. 1993).  Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Loza, 219 F.3d at 393; Spellman, 1 F.3d at 360.  This court may not "reweigh the evidence in the record, try the issues de novo or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision." Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000).  The Commissioner, rather than the courts, must resolve conflicts in the evidence.  Id.

The ALJ is entitled to make any finding that is supported by substantial evidence, regardless whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91 (1992).  Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence supports it.  Harper v. Barnhart, 176 F. App'x 562, 565 (5th Cir.

2006); <u>Villa v. Sullivan</u>, 895 F.2d 1019, 1022 (5th Cir. 1990); <u>Johnson v. Bowen</u>, 864 F.2d 340, 343-44 (5th Cir. 1988).  Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  <u>Newton</u>, 209 F.3d at 452; <u>Martinez v. Chater</u>, 64 F.3d 172, 173 (5th Cir. 1995).

To qualify for SSI, a claimant must be "disabled" as defined by the Act.  42 U.S.C. § 423(a)(1)(D).  In 1996, Congress passed the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("1996 Act"), which redefined the eligibility standard for children under the SSI disability determination process.  This statute applies to all child disability applicants who filed claims on or after August 22, 1996, or whose cases were not finally adjudicated before that date.  <u>Id.</u> § 211(d)(1)(A)(I).

According to the 1996 Act, "[a]n individual under the age of 18 shall be considered disabled for the purposes of this title if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  <u>Id.</u> § 1382c(a)(3)(C)(i).

The Commissioner's final regulations in effect at the time of the ALJ's decision provide a three-step procedure for evaluating a child's claim of disability.  The first step is to determine whether the claimant is engaging or has engaged in substantial gainful activity.  If the answer is "yes," the claimant will be found not disabled.  If the answer

is "no," the second step requires a determination of whether the claimant has a medically determinable severe impairment. If not, the claimant will be found not disabled. If the claimant has such an impairment, the last step is to determine whether the impairment meets or equals in severity, either medically or functionally, an impairment listed in Appendix 1, Subpart P, Part 404 of the Commissioner's regulations (the "Listings"). If the claimant has such an impairment and the impairment meets the duration requirement, the claimant will be found disabled. If not, the claimant will be found not disabled. 20 C.F.R. § 416.924 (2014).

The claimant has the burden of proof at all steps of the inquiry. Parks ex rel. D.P. v. Comm'r, Soc. Sec. Admin., 783 F.3d 847, 850 (11th Cir. 2015); Taylor ex rel. D.M.T. v. Colvin, 555 F. App'x 643, 643-44 (8th Cir. 2014) (citing Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004)); Lopez v. Barnhart, 176 F. App'x 618, 619 (5th Cir. 2006); Fox o/b/o HMB v. Berryhill, No. 16-16892, 2017 WL 7310104, at *2 (E.D. La. Dec. 12, 2017), report & recommendation adopted, 2018 WL 671231 (E.D. La. Jan. 31, 2018) (citing Fraga v. Bowen, 810 F.2d 1296, 1301 (5th Cir. 1987); 20 C.F.R. § 416.912(a)); Pickett v. Colvin, No. 3:15CV700, 2017 WL 439978, at *2 (S.D. Miss. Jan. 6, 2017), report & recommendation adopted, 2017 WL 422812 (S.D. Miss. Jan. 31, 2017) (citing Whitehead v. Colvin, 820 F.3d 776, 781 (5th Cir. 2016)).

The court "weigh[s] four elements of proof when determining whether there is substantial evidence of disability: (1) objective medical facts; (2) diagnoses and

opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) his age, education, and work history." Martinez, 64 F.3d at 174; accord Perez v. Barnhart, 415 F.3d 457, 462 (5th Cir. 2005).

B.    Factual Background

At the administrative hearing, Marshall was advised of her right to retain counsel to represent her and K.P., but plaintiff waived representation, opted to proceed and was sworn and testified. (Tr. 116-18).

Marshall testified that K.P. is five years old and is enrolled in kindergarten. (Tr. 118).  She confirmed that K.P. is undergoing speech therapy and that his speech is improving, "but he can't always say [words or sentences] correctly." (Tr. 118-19). Marshall testified that K.P.'s speech therapist says that "he always reaches 85 percent, but still, when he comes home . . . S . . . or . . . T, P, V [don't come out correctly]." (Tr. 119). Marshall confirmed that this was an "articulation deficit." (Tr. 119). She testified that K.P. was born with a developmental delay, and that he had an evaluation scheduled for January 31, 2017, with his primary care physician, Dr. Dennar at Arcadia Care. (Tr. 119).

Marshall testified that K.P. is being treated by Dr. Champa Chakraborti of JeffCare [a division of the Jefferson Parish Human Services Authority] for his attention-deficit hyperactivity disorder (Tr. 120), and that K.P. has been going to JeffCare since

2015. (Tr. 121). She testified that he takes Adderall[1] as of the date of the hearing, but since he only takes it during school, she could not answer whether there was a difference in his behavior when he takes the medication versus when he does not. (Tr. 120). Marshall testified that when K.P. comes home, he seems "sleepy" and "emotional . . . like he always wants to cry." She confirmed that she believes that these issues are caused by his medication, and that she has spoken about this to Dr. Chakraborti, who told her that she cannot change K.P.'s medication until he turns six years old. (Tr. 120). Marshall testified that K.P. has been on attention-deficit hyperactivity disorder medication since September 2016. (Tr. 121). Finally, Marshall confirmed that he sees a psychiatrist, whom she identified as the same doctor who treats him for attention-deficit hyperactivity disorder, Dr. Chakraborti.

As to K.P.'s schooling, Marshall confirmed that he has finished one semester of kindergarten and that the teacher "said he was bad . . . he don't (sic) listen . . . [h]e refuses to work." (Tr. 121). Upon questioning, Marshall testified that K.P. is completing another semester of kindergarten. (Tr. 121). The ALJ noted that K.P.'s report card says that he is "progressing." Marshall clarified that his teacher "mostly send[s] home . . . a Monday through Friday calendar and that's where [K.P.'s teacher] put[s] all the stuff

---

[1]Adderall (generic name: amphetamine aspartate monohydrate/amphetamine sulfate/dextroamphetamine saccharate/dextroamphetamine sulfate) is used for the treatment of attention-deficit hyperactivity disorder. It may help increase attention and decrease impulsiveness and hyperactivity in people with that disorder. PDRhealth (PDR Network, LLC), http://www.pdr.net/pdr-consumer-monograph/adderall?druglabelid=1048&ConsumerId=1008 (last visited June 11, 2018).

that he does [regarding behavior]." (Tr. 121). When asked whether he had been disciplined at school, Marshall answered that he has only received a behavioral report. (Tr. 121-22).

As to K.P.'s asthma, Marshall testified that he takes his medication on an as-needed basis. (Tr. 122). She testified that his asthma does not cause any limitations in his activities, but if he gets "over worked up" he uses his inhaler. (Tr. 122). Marshall confirmed that she is mostly concerned about K.P.'s speech and developmental delays. (Tr. 122).

K.P. was also sworn and testified. He testified that he does not like to go to school and does not like his teacher, but that he has friends and likes recess at school. (Tr. 122-23). K.P. testified that when he gets home in the evenings, he does his homework. (Tr. 123). He testified that he likes video games. (Tr. 123). He also testified that he takes his medication every day. (Tr. 123). K.P. testified that he thinks his medication helps him to focus better and that he feels different when he takes it, but he does not take the medication on the weekends. (Tr. 124). As to his speech problems, K.P. confirmed that he sees a therapist at school every day. (Tr. 124-25). Marshall spoke at this point and clarified that he sees a speech therapist two or three times a week. (Tr. 125).

C.    Medical Evidence

I have reviewed the medical records in evidence and the ALJ's summary of the medical evidence.  (Tr. 34-43).  I find the ALJ's summary of the medical evidence substantially correct and incorporate it herein by reference, with the modifications, corrections and highlights noted below.

D.    Plaintiff's Appeal

Broadly construed, plaintiff's pro se assignments of error appear to be that 1) substantial evidence does not support the ALJ's finding that K.P does not have an impairment or combination or impairments that meets or medically equals the severity of the listings, and 2)  substantial evidence does not support the ALJ's finding that K.P. does not have an impairment or combination of impairments that functionally equals the severity of the listings.

At step three of the sequential evaluation, the ALJ found that K.P.'s attention-deficit hyperactivity disorder, speech delay and asthma do <u>not</u> <u>meet or medically equal</u> any listed impairment, because his signs, symptoms and history of treatment are inconsistent with listing-level severity. Pertinent to plaintiff's appeal, the ALJ also found that K.P.'s severe impairments of attention-deficit hyperactivity disorder, speech delay and asthma do <u>not</u> <u>functionally</u> equal Listings 103.03, 112.02, or  112.11, because he has less than marked limitations in five of the six domains (acquiring and using information, attending and completing tasks, interacting and relating with others,

- 10 -

moving about and manipulating objects, health and physical well-being), and no limitation in the sixth (caring for yourself).

>    1.    Substantial evidence supports the ALJ's finding that K.P.'s impairments do not meet or medically equal Listings 103.03, 112.02 or 112.11.

As an initial matter, mere diagnoses of and treatment for attention deficit hyperactivity disorder, asthma and speech/language delays do not establish disability. 20 C.F.R. § 416.925(d); Bordelon v. Astrue, 281 F. App'x 418, 422 (5th Cir. 2008) (citing Hames v. Heckler, 707 F.2d 162, 165 (5th Cir. 1983)); McLendon v. Barnhart, 184 F. App'x 430, 431 (5th Cir. 2006); Harris v. Barnhart, 65 F. App'x 129, 132 (9th Cir. 2003); Estok v. Apfel, 152 F.3d 636, 640 (7th Cir. 1998); Jones v. Sullivan, 954 F.2d 125, 128 (3d Cir. 1991). Marshall must establish that K.P. meets the requirements of each listing to prove that the ALJ erred in finding that K.P.'s impairments do not meet or medically equal the listings.

>    A.    Listing 103.03

To meet or medically equal Listing 103.03 for asthma, K.P. must show that he had exacerbations or complications requiring three hospitalizations within a 12-month period and at least 30 days apart, with each hospitalization lasting at least 48 hours, including hours in a hospital emergency department immediately before hospitalization. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 103.03.

Whether an impairment or combination of impairments meets or medically equals a listing is a medical question that can be answered only by medical evidence. 20 C.F.R. §§ 404.1526(b), 416.926(b); McCuller v. Barnhart, 72 F. App'x 155, 158 (5th Cir. 2003); Selders v. Sullivan, 914 F.2d 614, 619 (5th Cir. 1990); McKnight v. Astrue, No. 07-1654, 2008 WL 4387114, at *3 (W.D. La. Aug 15, 2008), report & recommendation adopted, 2008 WL 5746939 (W.D. La. Sept. 23, 2008), aff'd, 340 F. App'x 176 (5th Cir. 2009). "The specified medical criteria [of a listing] are designed to be demanding and stringent because they lead to a presumption of disability[,] making further inquiry unnecessary." Anderson v. Astrue, No. 3:11-CV-0051-K-BH, 2011 WL 3331821, at *6 (N.D. Tex. July 11, 2011), report & recommendation adopted, 2011 WL 3347857 (N.D. Tex. July 29, 2011) (citing Sullivan v. Zebley, 493 U.S. 521, 532 (1990); Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994)).

Thus, Marshall "must demonstrate that [K.P.'s] impairment meets all the specified medical criteria of the listing, rather than merely some of the criteria." McCaskill v. Dep't of Health & Human Servs., 640 F. App'x 331, 334 (5th Cir. 2016). "An impairment that manifests only some of the requisite criteria, no matter how severely, does not qualify. If the plaintiff fails to demonstrate the specified medical criteria, the court will find that substantial evidence supports the ALJ's finding that listings-level impairments are not present." Gewin v. Astrue, 2011 WL 3924232, at *3 (W.D. La. Aug. 3, 2011), report & recommendation adopted, 2011 WL 3954877 (W.D.

La. Sept. 6, 2011) (citing Zebley, 493 U.S. at 530-31; Selders, 914 F.2d at 620); accord

Taylor v. Astrue, No. 3-10-CV-1158-O-BD, 2011 WL 4091506, at *8 (N.D. Tex. June

27, 2011), report & recommendation adopted, 2011 WL 4091503 (N.D. Tex. Sept. 14,

2011), aff'd, 706 F.3d 600 (5th Cir. 2012).

Marshall has not established that K.P.'s impairment of asthma meets or medically

equals Listing 103.02. She "fails to explain how [K.P.'s] symptoms align with the

criteria of the Appendix medical listing.  She cites [evidence] about [K.P.'s] medical

history, but does not show how this medical evidence demonstrates that [K.P.] meets

each of the required criteria under the Appendix medical listing." Heck v. Colvin, 674

F. App'x 411, 414-15 (5th Cir. 2017) (citing Zebley, 493 U.S. 521, 530 (1990); Perez,

415 F.3d at 461; Falco, 27 F.3d at 162) (quotations omitted).  Though the ALJ noted

that "[t]he claimant has a history of asthma, apparent exacerbations of which he

received care for several times during the relevant period," (Tr. 43), that care did not

include three hospitalizations within a 12-month period lasting 48 hours or more, (Tr.

819-23, 828, 861-63, 877-84.), which is indicative of his condition's lack of severity.

Additionally, Marshall testified that K.P. does not suffer any limitations in his daily

activities from asthma and that he has an inhaler if he gets "over worked up."

Accordingly, to whatever extent Marshall argues that the ALJ erred by finding

that K.P.'s impairment of asthma does not meet or medically equal Listings 103.03, this

assignment of error lacks merit.

B.    Listings 112.02 and 112.11

To meet or medically equal Listing 112.02 for speech delay, K.P. must show: (A) medically documented findings of a clinically significant deviation in normal cognitive development or by significant cognitive decline from a prior level of functioning in one or more of the cognitive areas: (1) complex attention; (2) executive function; (3) learning and memory; (4) language; (5) perceptual-motor; or (6) social cognition, and either (B) extreme limitation in one, or marked limitation in two of the following areas: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; or (4) adapting or managing oneself, or that K.P.'s disorder is "serious and persistent;" that is, a medically documented history of the existence of the disorder over a period of at least two years and there is evidence of both (1) medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of mental disorder and (2) marginal adjustment; that is, minimal capacity to adapt to changes in environment or to demands that are not already part of daily life. 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 112.02.

To meet or medically equal Listing 112.11 for attention deficit hyperactivity disorder, K.P. must have (A) medically documented findings of frequent distractibility, difficulty sustaining attention, and difficulty organizing tasks, and/or hyperactive and impulsive behavior; significant difficulties learning and using academic skills, or

recurrent motor movement or vocalization and (B) extreme limitation in one, or marked

limitation in two of the following areas: (1) understanding, remembering or applying

information; (2) interacting with others; (3) concentrating, persisting, or maintaining

pace; or (4) adapting and managing oneself. 20 C.F.R. § Pt. 404, Subpt. P, App. 1 §

112.11.

> "Extreme" is defined by the Commissioner's regulations as
> when your impairment(s) interferes very seriously with your ability to
> independently initiate, sustain, or complete activities. Your day-to-day
> functioning may be very seriously limited when your impairment(s) limits only
> one activity or when the interactive and cumulative effects of your impairment(s)
> limit several activities. "Extreme" limitation also means a limitation that is "more
> than marked." "Extreme" limitation is the rating we give to the worst limitations.
> However, "extreme limitation" does not necessarily mean a total lack or loss of
> the ability to function. It is the equivalent of the functioning we would expect to
> find on standardized testing with scores that are at least three standard deviations
> below the mean.

20 C.F.R. § 416.926a (emphasis added).

> "Marked" is defined by the Commissioner's regulations as
>
> when your impairment(s) interferes seriously with your ability to independently
> initiate, sustain, or complete activities. Your day-to-day functioning may be
> seriously limited when your impairment(s) limits only one activity or when the
> interactive and cumulative effects of your impairment(s) limit several activities.
> "Marked" limitation also means a limitation that is "more than moderate" but
> "less than extreme." It is the equivalent of the functioning we would expect to
> find on standardized testing with scores that are at least two, but less than three,
> standard deviations below the mean.

Id. (emphasis added).

Marshall has not demonstrated that K.P.'s impairments of speech delay and

attention-deficit hyperactivity disorder meet or medically equal Listings 112.02 or

112.11. As discussed above, she "fails to explain how [K.P.'s] symptoms align with the criteria of the Appendix medical listing.  She cites [evidence] about [K.P.'s] medical history, but does not show how this medical evidence demonstrates that [K.P.] meets each of the required criteria under the Appendix medical listing." Heck, 674 F. App'x at 414-15 (5th Cir. 2017) (citing Zebley, 493 U.S. 521, 530 (1990); Perez, 415 F.3d at 461; Falco, 27 F.3d at 162) (quotations omitted).

In her memorandum, plaintiff references reports by various evaluators to argue that K.P. does in fact have impairments in speech delay and attention-deficit hyperactivity disorder.[2] Specifically, plaintiff references diagnoses of speech delay by "Mrs. Jody at Lucille Cherbonnier/Norbert Riluex EM, School . . . [in 2015] . . . Mrs. Hailey and Mrs. Bethany . . . at West Jeff[erson Hospital] Rehab . . . in 2015-2018 . . . Chukwunnomnso, Dennar, MD . . . in 2015-present . . . Mrs. Kari Fast, MS/CCC-SLP dated 3/27/19 . . . [and] Evaluation Coordinator/Educational Diagnostician, Felicia L. Lloyd, M. Ed. . . . dated 1/15/19."  Record Doc. No. 20-2 at pp. 1-2. Plaintiff argues that K.P.'s attention-deficit hyperactivity disorder should meet or medically equal the listings by referencing diagnoses by "Champ Chakraborti . . . in 2015 . . . and Jennifer Medo, MD (2015-2016), and Byron Hammer, MD (2015-present) [who diagnosed K.P.] with [attention-deficit hyperactivity disorder]/combined type. [Also],

---

[2] In violation of the court's briefing order, Record Doc. No. 12, Marshall fails to provide specific citations to the record evidence as to these evaluations and diagnoses.

Chukwunnomnso, Dennar, MD [in] 2015 . . . diagnosed [K.P.] with [attention-deficit hyperactivity disorder].” Record Doc. No. 20-2 at p. 2. Plaintiff also states that K.P's “disability has caused him to decline in educational endeavors . . . his behavior is now being controlled with medical prescriptions such as [A]dderall 15mg . . . [h]e receives behavior reports due to his conduct . . . .” Id.

Marshall cites two exhibits in the record, which in fact illustrate that K.P. was found <u>not</u> disabled at the initial level. First, she cites Exhibit 1A, which is an initial disability determination by Glen B. Hall dated August 14, 2012, when K.P. was one year and one month old. (Tr. 127-133). In that determination, Hall noted a report dated July 30, 2012 by William E. Fowler, Ph.D., indicating that K.P. was “alert and interested in the environment . . . crawls and explores actively . . . using no useful speech except momma or some approximation of that, but language skills are developing . . . no significant delays noted on testing.” (Tr. 130). Hall concluded that “[t]he medical evidence shows that [K.P.] has [a] weight problem, bronchitis and developmental delay, but his condition is not severe enough to be considered disabling . . . [his] condition results in some limitations in the ability to function, but those limitations are not severe enough to be considered disabling . . . because his . . . condition does not cause marked and severe functional limitations.” (Tr. 132).  Marshall also cites a second initial disability determination by Samantha J. Suel, in September 11, 2015, when K.P. was 4 years and 2 months old. (Tr. 135-50). In that determination, Suel found that K.P.'s

"condition results in some limitations in his ability to function, but those limitations are not severe enough to be disabling . . . [a]lthough he has some difficulty speaking, his speech can be heard and understood." Id.

The ALJ gave some weight to these opinions of the state agency consultants, who found that K.P. had less than marked limitations in acquiring and using information and interacting and relating with others. (Tr. 37 (citing Tr. 146-47)).  The ALJ found that these opinions were "relatively consistent with the evidence . . . [but] they do not fully account for the effects of his asthma or his difficulties in school, and so they are only entitled to weight to the extent consistent with the record as a whole." (Tr. 37).

As in those determinations, the ALJ found that K.P.'s impairments did not meet Listing 112.02 or 112.11 because he did not have "extreme or marked limitations in understanding, remembering, or applying information, interacting with others, concentrating, persisting, or maintaining pace, or adapting or managing himself, nor is his neurocognitive disorder 'serious and persistent.'"

Substantial evidence supports the ALJ's findings. K.P. was first treated for difficulty communicating in October 2013 when he was two years old by Dr. Brent Nick, who noted that K.P. was primarily communicating his needs and wants by pointing and babbling. (Tr. 454). Dr. Nick noted that K.P.'s "vocabulary consists of about 8-10 words," and "does not often play with other kids his age, but when he does, they [cannot] understand what he says." (Tr. 454). Finally, the "therapist noted

difficulty following simple directions/listening." (Tr. 454). K.P. was seen by Dr. Nick again in March 2014. In that report, Dr. Nick observed that K.P. "has attended 19/28 scheduled sessions and continues with improved attendance and participation in therapy . . . [he] has met two short term goals as he is able to identify 20 common objects and name 5 common objects. [K.P.] is currently progressing toward being able to produce /m/ in the initial position of words, identify common objects, and name common objects. [K.P.'s] behavioral issues are slowly improving. [His] mother is present during every session and has reported his recent, progressing ability to make requests, utilize more words, count to five, and distinguish between 'you/me,' and 'boy/girl.'" (Tr. 422-23.)

The ALJ noted and the record reflects that K.P. attended 20 speech therapy sessions between March 2014 and February 2015, during which time it was observed that his speech was progressing, but he was still difficult to understand. (Tr. 35 (citing Tr. 369)). However, the therapist noted that his "speech intelligibility has improved." (Tr. 369). K.P. attended three speech therapy sessions between February and April 2015, where he showed improvement with "p," "m" and long "e" sounds. (Tr. 36 (citing Tr. 503-504)). The therapist also noted that his "mother is present each session to assist with controlling his behavior." (Tr. 504).

The record reflects that when K.P. was three years and 11 months old in June 2015, his preschool teachers requested that he be evaluated for behavioral issues such

as not listening or staying focused. (Tr. 518). He was subsequently diagnosed with attention-deficit hyperactivity disorder. (Tr. 529). In July 2015, his speech therapist noted that K.P. had made more progress with pronunciation of "p" and "m" sounds, and his speech was improving each session, although standardized testing still indicated a severe articulation deficit. (Tr. 812). That same month, his psychiatrist Dr. Chakraborti noted that K.P. was "very active, cannot [sit] still in class, fights and does not listen to adults. . . . having problems learning and retaining information . . . was able to identify some letters, but gave up coloring pretty quickly . . . [his mother reported that] some nights he had trouble getting to sleep, [and he is] not aggressive [at school] but is . . . active." (Tr. 530-31).

The ALJ cited the examination of speech pathologist Kristi Hubbard in August 2015, when K.P. was four years and two months old, who observed that K.P. "separated from [his] parent with ease, interacted freely with examiner and followed examiner's direction and tasks throughout testing. He was cooperative, happy, and motivated." (Tr. 36 (citing Tr. 800)). The ALJ noted that Hubbard found that "receptively, there was no delay, as [K.P.] was able to understand and comprehend routine information, and expressively, there was no delay, as [K.P.] was able to express his basic wants and needs with language." Id. Hubbard noted that there was a mild delay in vocabulary, but found that he was adequate in topic initiation, topic maintenance, topic repair, topic closure, turn-taking, gesture/body language, relevancy of response and response time. (Tr. 801).

The ALJ noted that in October 2015, K.P. had attended 11 recent speech therapy sessions, and was progressing in his pronunciation of "f" and "g" sounds, with slight progress and decreased cueing. However, he still required redirection and maintained a severe articulation delay. (Tr. 1071). That same month, his psychiatrist Dr. Chakraborti noted that K.P. was "less active . . . slightly . . . calmer, and manageable [while at school]." (Tr. 852). In December 2015, he underwent another speech pathology evaluation at school, at which time his language skills were observed to be within normal limits, verbalizations were appropriate and relative to the conversational topics, and he was able to initiate and elaborate upon topics of conversation. His scores were .73 standard deviations below the norm. Development of grammar and syntax were judged to be appropriate and consistent with local dialect. However, the examiner noted that "he was hard to understand at times due to poor speech intelligibility." (Tr. 232).

In January 2016, K.P. was described as "doing okay" at school and tolerating his medications, with no incidents of anger outbursts, and he had reportedly calmed down at school. (Tr. 851). K.P. continued to attend speech therapy, having met seven short-term goals and three long-term goals, with progress with "k" and "g" sounds, although he remained partially unintelligible. (Tr. 1019). That report also notes that K.P. had begun coming to sessions without his mother and presented with increased attention. (Tr. 1019). When he sought medical care for a cough in April 2016, Dr. Mia Weber noted that K.P.'s speech was "coherent with a small impediment." (Tr. 878). In July 1,

2016, Dr. Chakraborti noted that K.P. was doing slightly better on prescribed medication, although he was reported still to be very active, talkative and fidgety. (Tr. 850). The ALJ noted that Dr. Chakraborti stated that, upon "examination, [K.P.] exhibited unimpaired attention and recent and remote memory." (Tr. 37 (citing Tr. 850)).

K.P. continued in speech therapy through October 2016, at which time he had met thirteen short-term goals and six long-term goals, and the therapist noted that his attention had improved. (Tr. 923-24). During that month, K.P. was seen by Dr. Chakraborti, who observed that he was "responding to [his stimulant medication]," his behavior was "appropriate," and his "attention span was not decreased." (Tr. 1134-35).

During his initial kindergarten Individualized Education Program evaluation in November 2016, the evaluator noted that K.P. was on level with his age curriculum and had strong foundational skills in English and mathematics, and while his articulation impairment was noted to interfere with his social success in the classroom, his voice, language and fluency skills were found to be within normal limits. (Tr. 300). By December 2016, K.P. was again seen by Dr. Chakraborti, who noted that Marshall was "pleased with his progress since he . . . started on Adderall . . . his behavior has settled down . . . school is not complaining about his fidgetiness, he is calmer, more focused and less active in class." (Tr. 1134).

The medical records, combined with the state agency opinions, are substantial evidence that K.P. did <u>not</u> exhibit extreme or marked limitations in understanding, remembering, or applying information, interacting with others, concentrating, persisting, or maintaining pace, or adapting or managing himself, as required by Listings 112.02 and 112.11. Substantial evidence demonstrates that K.P.'s impairments are steadily improving and/or treatable with therapy and medication. His speech delay is likewise not "serious and persistent," as required to meet Listing 112.02, because the medical evidence indicates that he showed improvement with treatment and that improvement demonstrates that he has more than minimal capacity adapt to changes in environment and to future demands to his daily life. As noted above, when K.P. sought medical care for a cough in April 2016, Dr. Mia Weber noted that his speech was "coherent with a small impediment." (Tr. 878), and in November 2016 his voice, language and fluency skills were found to be within normal limits. (Tr. 300). The ALJ's findings are supported by substantial evidence.

Accordingly, to whatever extent Marshall argues that the ALJ erred by finding that K.P.'s speech delay and attention-deficit hyperactivity disorder do not meet or medically equal Listings 112.02 or 112.11, this assignment of error lacks merit.

2.    <u>Substantial evidence supports the ALJ's finding that K.P.'s impairments do not functionally equal Listings 103.03, 112.02 or 112.11.</u>

After finding that K.P. does not meet or medically equal the severity of one of the listed impairments in 103.03, 112.02, or 112.11, the ALJ found that K.P. does not

have an impairment or combination of impairments that functionally equal the severity of the listings, because he has less than marked limitations in acquiring and using information, attending and completing tasks, interacting and relating with others and moving about and manipulating objects, and found that he has <u>no</u> limitation in his ability to care for himself. Construing her arguments broadly, Marshall contends that K.P. has marked limitations in the health and physical well-being domain.

An ALJ must assess functional equivalence in children by examining the child's limitations in six domains: "(i) Acquiring and using information; (ii) Attending and completing tasks; (iii) Interacting and relating with others; (iv) Moving about and manipulating objects; (v) Caring for yourself; and, (vi) Health and physical well-being." 20 C.F.R. § 416.926a(b)(1). An impairment or combination of impairments functionally equals a listed impairment if it results in marked limitations in <u>two domains</u> or an extreme limitation in one. <u>Id.</u> § 416.926a(a). The definition of "marked," as stated above, is "more than moderate but less than extreme," and/or demonstrated by a valid standardized test score that is two standard deviations below the norm. <u>Id.</u> § 416.926a(e)(2)(i), (iii). The definition of "extreme," as stated above, is "more than marked," and/or demonstrated by valid standardized test scores that are three standard deviations below the norm. <u>Id.</u> § 416.926a (emphasis added).

The evidence as a whole substantially supports the ALJ's finding that K.P. does not have marked limitations in at least two of the six domains listed above. As discussed

above, the ALJ gave some weight to the state agency physicians' opinions, which are supported by K.P.'s medical records, that do not support any marked functional limitations.  It is well established that the ALJ may rely on the non-examining expert's function-by-function analysis of the impact of claimant's impairments on his ability to perform various tasks.  Beck v. Barnhart, 205 F. App'x 207, 213-14 (5th Cir. 2006) (citing Onishea v. Barnhart, 116 F. App'x 1, 2 (5th Cir. 2004); Myers v. Apfel, 238 F.3d 617, 620-21 (5th Cir. 2001); SSR 96-8p, 1996 WL 374184); accord Weatherspoon v. Astrue, 2013 WL 5507293, at *5 (E.D. La. Sept. 30, 2013) (citing Onishea, 116 F. App'x at 2).  No medical evidence contradicts the agency doctors' assessments.  Indeed, as previously discussed, the medical evidence substantially supports the ALJ's findings that K.P. has less than marked impairments in all of his functional areas.

The medical records summarized above generally reflect improvements in K.P.'s impairments of asthma, speech delay and attention-deficit hyperactivity disorder with therapy and medication. Specifically, as to the only domain Marshall references in her memorandum, health and physical well-being, the ALJ noted that K.P. "has a history of asthma, apparent exacerbations of which he received care for several times during the relevant period, although breath sounds were generally normal, with no respiratory distress or wheezing, and he used a rescue inhaler only as necessary." As noted above, Marshall testified at the hearing that K.P. does not suffer any limitations in his daily activities from asthma, and that he uses his inhaler if he gets "over worked up." A

medical condition that can reasonably be remedied by surgery, treatment or medication is not disabling.  Muckelroy v. Astrue, 277 F. App'x 510, 511-12 (5th Cir. 2008) (citing Burnside ex rel. Burnside v. Bowen, 845 F.2d 587, 592 (5th Cir. 1988), abrogated on other grounds by Sullivan v. Zebley, 493 U.S. 521, 527 (1990)); Hebert v. Barnhart, 197 F. App'x 320, 323 (5th Cir. 2006) (citing Johnson v. Bowen, 864 F.2d 340, 348 (5th Cir. 1988)); Leblanc v. Chater, 83 F.3d 419, 1996 WL 197501, at *3 (5th Cir. 1996); Lovelace v. Bowen, 813 F.2d 55, 59 (5th Cir. 1987).

Substantial evidence therefore supports the ALJ's findings that K.P. has less than marked limitations in the six domains. Because he does not have marked limitations in at least two domains, he does not functionally equal any Listing. Accordingly, this assignment of error lacks merit.

## **RECOMMENDATION**

For the foregoing reasons, **IT IS RECOMMENDED** that plaintiff's appeal be denied, and her complaint be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.

- 26 -

Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[3]

New Orleans, Louisiana, this ____19th____ day of June, 2019.

_____

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[3]Douglass referred to the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.